Next case for argument is Nischan v. FCA, Ms. Fell. Nischan v. FCA US LLC Okay, the extent of the organization's control and supervision over the plaintiff. So in this case, Mr. Saba had the authority to train Ms. Nischan. He had the authority to evaluate her work. He eventually gave suggestions regarding personnel actions relating to her. He suggested that she be removed from her supervisor position. She was eventually demoted. When that was not sufficient for him, two days later he requested that she be removed from the lot. She was removed from the lot. The second factor is the kind of occupation and nature of skill required, including whether skills are obtained in the workplace. At summary judgment, we established that Mr. Saba trained Ms. Nischan on the type of work that she performed while she was working at Chrysler. The third factor is the responsibility for the cost of operations, such as equipment, supplies, fees, licenses, workplace, and maintenance of operations. There was an agreement between Chrysler and Stratosphere that provided for the, that the cost would be, or the supplies used in Nischan's employment would be covered by Chrysler. This agreement also provided that the lot would be rented out by Chrysler, which shows that the location of Ms. Nischan's employment was also being rented out by Chrysler. The fourth factor, the method and form of payment and benefits, this same agreement also provided for the wages that would be allocated to the employees who would be staffed at this Chrysler workspace. And the fifth factor is the length of job commitment and or expectations. It was Ms. Nischan's expectation that she would be working in this position for a significant amount of time and for the unforeseeable future. Therefore, it is our position that Ms. Nischan has established the five factors to determine an employment relationship under the Knight case. When's the first time she complained about this? She complained to Mr. Saba personally in June... No, not to him, to whomever she thought was someone she could report this to. Sometime in July or August of 2012, she was in a trailer with Mr. Saba and two supervisory employees for Stratosphere. During that time, Mr. Saba engaged in sexually harassing conduct against Ms. Nischan. A Stratosphere manager by the name of Michelle Blackman witnessed this event and even went so far as to console Ms. Nischan when she left the trailer in tears. In the summary judgment brief, we also stated that another supervisory employee of Stratosphere, Jim Harris, was present in the trailer. Ms. Nischan did not know for certain whether he witnessed this conduct, but I think it raises a genuine issue of material fact as to whether he should have observed this conduct or believed that something had occurred. Wasn't Blackman required by the handbook to report the case of sexual harassment? That's correct, and she did not. What's the basis of her suit against Stratosphere? The basis of her suit against Stratosphere is that Stratosphere was negligent in discovering or remedying the sexual harassment that had occurred. So why did she have to sue Chrysler and Chrysler? Because Chrysler was her joint employer and Chrysler has also... No, Chrysler was not her employer. Stratosphere was her employer. So why isn't that enough? If Stratosphere was negligent in its dealings with Chrysler, why wouldn't that be part of the damages that she would obtain against Stratosphere? Your Honor, we respectfully disagree. We stand by our belief that Chrysler was her joint employer, and in the case of Chrysler, they are strictly lying. Well, I don't think that's right. But in any event, if you sue Stratosphere, I don't know why you have to sue Chrysler. If Stratosphere is responsible for irresponsibly bringing Chrysler into the picture and not noticing this creature Saba, all the damages caused by Chrysler and Saba are the responsibility of Stratosphere. Your Honor, I... I don't understand why you're suing three parties for exactly the same thing. That's correct, Your Honor, because all three parties have engaged. You might want to agree with Judge Posner in his suggestion. Oh, sorry? You might want to agree with Judge Posner's suggestion that you've got a viable defendant. One. Stratosphere. In Stratosphere. Could you repeat your question again, Judge Posner? Pardon? Could you repeat your question? Well, Judge Kaney made it very clear. When did you notify Stratosphere? Everything you charge against Chrysler and Saba, you also presumably are charging against Stratosphere because Stratosphere is responsible for bringing Chrysler into the picture without screening Chrysler's employees to get rid of Saba. So I just don't understand the multiple suits, all seeking identical relief. I think that there are some differences between the three defendants. In the case of Chrysler, I believe that they were strictly liable because Saba was a supervisory employee. So when she was sexually harassed by Mr. Saba and complained to Saba… No, no, look. Didn't Stratosphere know about Saba? Yes, they did. And what did it do about Saba? They did nothing. Nothing. Right. So all your Saba damages are also damages caused by Stratosphere. So all you did was complicate life by having three defendants instead of one defendant. Okay. Thank you, Your Honor. If there are no further questions, I would like to reserve my remaining time for rebuttal. That's fine. Thank you. Mr. Denton or Harris? I don't know which track, but… May it please the Court. Dwayne Denton on behalf of Appley Stratosphere Quality, LLC. And Judge Caney, I'm going to address your handbook comment in just a moment, but I'd like to do it in context. We believe that the district court's decisions were all correct and should be affirmed in all respects as to Stratosphere Quality. Michelle Nashan was an employee of Stratosphere Quality, and she was supervised by two Stratosphere Quality employees. Davina Turlock was her direct report, who was her boss, her boss, and her boss's boss was the operations manager, James Harris, both Stratosphere Quality employees. Those two employees had supervisory authority over her. Those two employees were the ones that directed her employment, and those two employees were the ones that decided that she failed in their performance expectations. That began almost immediately after she became a project supervisor in July. Almost immediately, the record shows Davina Turlock, Stratosphere Quality employee, had to counsel her for her mistakes. Ms. Nashan admitted in her deposition she made mistakes. On August 7th, Davina Turlock, Stratosphere Quality employee, disciplined her with corrective action for these mistakes. On August 21st, Davina Turlock, Stratosphere Quality employee, sent her home for being late. On September 11th, Davina Turlock and James Harris, both Stratosphere Quality employees, her boss and her boss's boss, met and decided that she was not meeting her expectations and that they would demote her to project supervisor. That email from James Harris is in the record, 83-4. It shows that it is their decision. His words were, Davina and I have observed and we've decided. That was made by those two Stratosphere Quality employees. Emails to Stratosphere Quality HR coordinating the decisions. Then on September 21st, she got sent home for coming to work late by Davina Turlock, Stratosphere Quality employee. A few days later, or in the next couple of days, we have this hood-popping incident that causes extreme embarrassment to my client, whose middle name is Quality. What is the hood-popping thing? Is that where she pops a hood instead of something about the tires? Correct. Ms. Michon was responsible for a project involving checking brake sensors. These are vehicles that could end up with consumers.  She was asked by the FCA, formerly known as Chrysler, by the FCA yard manager, show me that you know how to do this brake inspection. She walked to the car, popped the hood, put her head under the hood. That was that. Of course, the brakes are nowhere near the engine. That was that. That caused Davina Turlock, Stratosphere Quality employee, to send an email on September 24th to Stratosphere Quality Human Resources saying, we have a change of course. We are no longer going to go with the demotion. We have to get Michelle Michon off the lot. That happened on September 26th. Was she fired or just sent to another part of Stratosphere? No, Your Honor. She was not terminated. She admitted in her deposition multiple, multiple times. What was her new job? She was told to call in. My client, Stratosphere Quality, works not just at Chrysler FCA, but all kinds of places in the area. Call in. Go to the office that you know where it is. Call in. We'll have another job for you. She never did. She admitted in her deposition she chose to file unemployment. When did she report the harassment? After. More than a week after all this happened, October 8th. That was the first time anyone at Stratosphere Quality knew anything about this. Wait, wait, wait. Yes. What about Ms. Blackman? Yes. Okay. You knew about her before then. The allegation is that Ms. Blackman knew about it, and I appreciate that. That's going to come to your question, Judge. Ms. Blackman, Michelle Nishan's testimony. There are two Michelles. I apologize if I mess it up. But Michelle Nishan and Michelle Blackman were friends. They were co-employees. They were both project supervisors. They worked together at the same level. At the same level, Your Honor. To the extent that Michelle Blackman had some duty to report up, and we would believe she did, so did Michelle Nishan. And in terms of the handbook, Ms. Nishan wants to rely on the handbook now to argue that it was reasonable for her to rely on Ms. Blackman seeing this alleged event. By the way, one event, one incident. Pretty bad. I agree. I totally agree. The question under the case law with respect to constructive knowledge, Your Honor, is is it reasonable, as this court decided in the Bear case, is it reasonable from the perspective of a complainant to expect that that complaint would work its way up the ladder? Now, keep in mind, it wasn't a complaint. It's undisputed. Michelle Nishan never, ever, ever complained to anyone before the decision was made. What she says instead is Michelle Blackman saw one incident, and that should be constructive knowledge. Under Bear, that depends entirely on reasonableness. Would the complainant have reasonably expected? Well, the answer to that is really simple. She wasn't being observed by someone up the chain. She was being observed by her buddy, her co-worker. But the handbook says any supervisor. Totally agree. Unfortunately, Ms. Nishan cannot rely on the handbook because she will start and end this argument telling you she never had a handbook. Okay? She did not have the handbook. She doesn't know what the handbook says. She doesn't know about it until she gets it in this case. How about Ms. Blackman? Well, we don't know that. The question, Your Honor, I appreciate that, is that the question under Bear is was it reasonable from the complainant's perspective. Ms. Nishan didn't have this procedure. Now, she knew how to get it. We all know that. And I want to make this point. She knew how to get the handbook. She knew we had one, and she knew how to get it. Her testimony is, on my first day, they told me I had a handbook. They told me they were going to send it to me. I didn't get it. And it was when she got sent home on September 21st that she got angry  I'm sorry, Your Honor. My time has expired. It puzzles me slightly. When she looked for the brakes in the engine, couldn't someone have said, Look, you have to crawl under the car. That's where you'll see the brakes. Make sure the brake linings look fine. Couldn't they have equipped her pretty easily to be able to be a brake inspector? Your Honor, that is what had been happening for the previous three months. She had been counseled and counseled. She received corrective action, counseled in July by Davina Turlock, corrective action in August 7th, and then additional counseling that led to the demotion decision on September 11th. And before that got implemented, remember, then she got sent home. And now she remembers, we've got a handbook, and she goes to the employment office, says, I need the handbook because I've got to look at the attendance policy because I'm really, really mad. And she calls HR to complain about attendance, not about harassment, but about attendance. By the time the hood-popping incident happened, Stratus for Equality had tried and tried to get her to understand the instructions, and she just wasn't getting it. And I urge you to look at the September 3rd and the September 24th and September 25th and September 26th e-mails, record 83, 16, and 17, to see how frustrated her supervisors at Stratus for Equality were, Davina Turlock and James Harris. Thank you, Your Honors. Okay, thank you very much, Mr. Fell. Mr. Dent? Oh, I'm sorry. Mr. Harris? I'd be more than willing to let Mr. Dent continue on. I'm sorry. I'd be more than willing to let Mr. Dent continue on. It would mean I wouldn't have to stand in front of you and answer any questions. No, we want to hear from you. Who do you represent? I represent FCA, formerly known as Chrysler, and Mr. Savant. May it please the Court. My opponent does one thing that I agree with, which is that she brings to mind here that this case rises and falls on one premise, and that premise is that Chrysler happens to be her employer. She cites to the Knight case. The Knight case was decided by this Court, and more recently the Love case, which we believe is Simo. Before I start, my opponent is proposing something that's unprecedented. That is, there's a five-factor test on her Knight. At the summary judgment stage, she did not address factors 3, 4, or 5. The district court promptly concluded that she had waived those arguments because she did not respond to our arguments whatsoever. And so, in essence, she's asking this Court to look at a five-factor test after she's already conceded three of the factors and move forward overturning a well-reasoned decision by the district court. That's unprecedented. The Knight test is a test that's been used for some time in this circuit to determine whether or not an entity is an employer. It has five factors. The first factor is control and supervision. And this Court has said on numerous occasions that the key powers under factor 1 is hiring and firing. There's no dispute that FCA did not have the ability and did not have anything to do with Ms. Nashawn's hiring. In fact, she showed up at Stratosphere. She filled out an application for Stratosphere. Her I-9 was with Stratosphere. W-2 was with Stratosphere. There was an FCA employee in sight, and there's no dispute about that. Regarding the firing, the undisputed evidence shows that FCA did not have the ability to fire her. At no time did Mr. Sabat or anyone else from FCA demand that she be fired. Rather, akin to what happened in the Love case, we simply didn't want her and her deficient performance on the lot looking after our vehicles. That is wholly different than firing. We couldn't do it. And I think the district court did a great job in noting that we certainly didn't have that unilateral power because we had to request at least four times for her not to be on the lot working on our vehicles. These are safety issues, and we need to make sure that the consumers are not put in a position where they have defective cars. That's the importance of what Ms. Michon and her crew did. In the Love case, this court found that the putative contractor did not hold the key power of firing when he could ban workers from the job site but could not end their employment. That's exactly what happened here. But I think importantly in the Love case, what distinguishes it in our favor is that Love retained the right to unilaterally remove from the workplace. There is no evidence in the record that FCA had that right. And of course the record shows that we didn't because we had to keep asking. One of the other factors as it relates to control is supervision. And it's important to understand how this comes about. When a quality issue is found to exist, FCA engineers and professionals would provide specifications for repair or inspection to Mr. Sebab. Mr. Sebab would then provide them to the managers of Stratosphere. The managers of Stratosphere would then come up with specific procedures on how to fix that. When they came up with their worksheets and specific procedures, the record is crystal clear that it was not necessary to get Mr. Sebab or FCA's approval. So the notion that Mr. Sebab was a supervisor in that context is simply unfounded. Rather, what Mr. Sebab did is exactly what this court talked about in the Love case, which was that minimal oversight was no more than being in a position to look at the result to be achieved. That is the end product. Regarding scheduling, which is another sub-factor of factor one, it is undisputed that Ms. Nishan took breaks and time off at Stratosphere's discretion.  In fact, an interesting point is that on the 21st, when she called in HR, she was calling in because she was mad because of the schedule that her supervisor had put her on, Ms. Turlock. She didn't call to complain about Mr. Sebab or anything that Chrysler had done or FCA. Who did she complain to? The other ultimate person that she did complain to. I don't mean to be flippant because I can actually hear myself saying this before it comes out, so I apologize ahead of time. But she didn't complain to anyone at FCA. I know that. I mean, explain to somebody. Well, it's my understanding, and the reason why I was saying I didn't want to be flippant because that Stratosphere's issue and what they're talking about is if you take a look at the record, she admits that she did not tell anybody at FCA at any time about any alleged discrimination. She also stated in the record that she didn't tell anyone at Stratosphere in June, July, August, or September. That's in the record. What we do see in the record is in October 8th she called Stratosphere and made a complaint. You know, she was observed by another supervisor who consoled her afterwards for the sexual harassment she was undergoing. That's the allegation. I know that's the allegation. We haven't had the trial. Right. It's noted. But that individual did not work for FCA. No, I didn't say he did. Nor did that person tell FCA about it. Are you talking about Chrysler or FDA or whoever it is? I'll stick to Chrysler because I represent them and I often flip back to Chrysler. But before I go any further, we've heard a lot about Mr. Sabat. I want to be clear that he categorically denies all of these allegations. Factor two deals with the occupation and skills. And I'll be quick here. Love is instructive. What the court says, and I quote, a plaintiff is free to leave the company at any time and use their skills elsewhere. This weighs in favor of the company not being her employer. Those are words from this court. Clearly, she could take her skills anywhere. And she learned her skills before she came to Chrysler because she was an inspector before she came to Chrysler. That takes care of the first two factors. The other three factors weren't ever addressed. But if the court would like for me to go through them, I'd be more than happy to. That's okay. The issue... Am I over time? Yeah. Then I'll sit down and thank you for the opportunity. Thank you, Mr. Harris. So, Ms. Pell? No, what is it? Ms. Pell? Anything further? Yes, ma'am. As an initial point, Chrysler's position is that Ms. Nishan has not complained to anyone at Chrysler. That is incorrect. She made numerous complaints to Mr. Saba himself, who was a supervisory employee. Going to the September 25th email that counsel had previously referenced where Stratosphere's management had decided to remove Ms. Nishan from the lot, there were two issues with her performance that were referenced. The first was that Mr. Saba had claimed that she had spent too much time talking to the suppliers in the lot, and the second reason was that she had incorrectly identified a few vehicles as nonconforming when they were actually conforming. Stratosphere's position is that Ms. Nishan's performance was so deficient that she had humiliated them in front of an important client. This incident was not referenced in the email in which management ultimately decided to remove her from the lot. It is also telling that this email occurred a couple days after Ms. Nishan most aggressively opposed Mr. Saba's conduct to himself. Mr. Saba followed that up the next day by contacting Stratosphere to inform them that Ms. Nishan's work was deficient and he wanted her demoted. Counsel for Chrysler referenced the Love case. In our response to their motion for summary judgment, we explained that we believe that this case is distinguishable from the Love case, particularly because Mr. Saba had the authority to suggest that Ms. Nishan be demoted and ultimately Stratosphere did demote her. If this Court has no further questions, I respectfully request that this Court reverse and remand the District Court's decision. Thank you. Okay, well thank you very much, Ms. Bell.